Grossman, Appellee, v. Samuel Grossman, Appellant.

Gen. No. 42,016.

346

Heard in the third division of this court for the first district at the October term, 1941. Reversed and remanded with directions. Opinion filed June 24, 1942.

RATHJE, HINCKLEY, BARNARD & KULP, of Chicago, for appellant; FRANCIS E. HINCKLEY, of Chicago, of counsel.

EHRLICH & COHN, of Chicago, for appellee; BENJAMIN H. EHRLICH and AARON H. COHN, both of Chicago, of counsel.

### REHEARING OPINION.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

On July 26, 1939 Anita Grossman filed her complaint in the superior court of Cook county. She alleged that on January 12, 1939, she married Samuel Grossman at Chicago; that they cohabited as husband and wife until on or about July 23, 1939, at which time he left her; that she was, at the time of filing the complaint, living separate and apart from the defendant without any fault on her part; and that he was a man of large means and owned three moving picture theatres and other properties which were held for him in the name of his son or daughter or others. On August 18, 1939, defendant moved to dismiss the complaint on the ground that the court did not have jurisdiction of the subject matter. The affidavit supporting the motion set up that on January 24, 1934, plaintiff, whose name was then "Annitta Levin Rest," exhibited in the superior court of Cook county her complaint against her then husband, Sigmund Rest; that in said

complaint she represented that the parties were married on January 20, 1928; that they cohabited as husband and wife until November 4, 1933; that her then husband had been guilty of extreme and repeated cruelty; that on November 4, 1933, Sigmund Rest deserted and absented himself from her without any reasonable cause and persisted in such desertion; that constructive service was had on said Sigmund Rest; that on his failure to appear the complaint was taken as confessed against him; that after the hearing of evidence adduced in behalf of the plaintiff the court found that she had failed to sustain her allegations of extreme and repeated cruelty; that the court found that the defendant Sigmund Rest had wilfully deserted and absented himself from plaintiff without any reasonable cause for the space of more than one year immediately prior to the filing of the complaint and that the court entered its decree of divorce in favor of plaintiff and against said Sigmund Rest. The affidavit also stated that plaintiff did not charge against said Sigmund Rest the ground of divorce upon which the purported decree was granted, and that it appeared affirmatively from the record that the ground of divorce, namely, wilful desertion without any reasonable cause for the space of one year, did not exist at the time of the filing of the complaint and at the time the decree for divorce was entered. The defendant maintained that the supposed marriage between the parties to this cause was void because the plaintiff had another husband living and not divorced from her at the time of such alleged marriage. On September 22, 1939, the court denied defendant's motion to dismiss the complaint. On October 11, 1939, defendant filed his answer. He again asserted that his alleged marriage to plaintiff was void for the reasons set out in the affidavit accompanying his motion to dismiss. He stated that he did not acquire the knowledge on which the motion to dismiss was based until after the instant

complaint was filed. He also stated that in the hearing of the divorce complaint filed by plaintiff against Sigmund Rest plaintiff testified that she had lived with said Sigmund Rest until November 4, 1933, and that on the latter date he (Sigmund Rest) deserted her without cause. He denied that during the time the parties lived together, supposedly as husband and wife, she conducted herself toward him as a good, true, loving and dutiful wife, and asserted that shortly after the marriage she commenced a course of wanton extravagance and incurred extensive obligations without his knowledge or consent; that on April 22, 1939, while he was living with her at the Carolan Hotel, Chicago, he entered the South Shore Hospital for medical care; that he returned to his apartment on April 25, 1939; that during the time he was in the hospital she made no effort to see him or get in touch with him; that upon returning to his apartment on April 25, 1939, he discovered that she had departed therefrom; that he had no means of knowing where she was; that later he learned from a son of plaintiff that she had left Chicago. and had gone to Antigo, Wisconsin; that thereafter he persuaded her to return to him; that she returned on or about May 15, 1939; that they lived as husband and wife until on or about July 20, 1939, at which time defendant was required to go out of the city upon a business trip; that on or about July 30, 1939, he learned that plaintiff had again abandoned the home where the parties were living and that she had filed her complaint seeking separate maintenance. He denied that he ordered the plaintiff out of the premises, or that he abandoned her, or that he refused to live with her. He also denied that he was a man of large means, and stated that he had only a small amount of money and no real estate or any interest in real estate or in any theatres. He also denied that he had any properties or assets which he concealed in the name of his daughter or son, and asserted that plaintiff was a

woman of large and substantial means. On September 29, 1939, plaintiff asked the court to make an allowance for temporary alimony, solicitors' fees and suit money. Thereupon the court referred the cause to a master in chancery "to take and report evidence with reference to the condition in life of the parties and their circumstances" with his conclusions thereon. The court retained "jurisdiction to enter any order for temporary alimony as of this date." This order was approved on its face by the attorneys for the respective parties. Testimony was commenced before the master on October 4, 1939, and concluded on January 11, 1940. Subsequent to the entry of the order of reference, the term of the master expired. An order was entered authorizing him to continue as a special commissioner. The special commissioner, reporting to the court, concluded that "neither plaintiff nor defendant has at present any income, in the sense of income from investments or compensation for services. It further appears, however, that in spite of the reluctance of both parties to admit the ownership of any income producing assets, each of them is able to live comfortably without the help of the other and that, if any urgent need arose, that each of them would be able to raise a reasonable amount of money. Taking all the evidence together, it appears to me that an allowance to either party of temporary alimony is not warranted. The plaintiff has claimed an allowance on account of temporary solicitor's fees. For the reasons indicated, it appears to me that, although when this cause comes on to be heard on the merits, it may appear that the plaintiff is entitled to solicitor's fees, there is now no urgency in her application and that if it should become necessary for her to pay for services rendered by counsel up to date, that she is in a position to do so." Plaintiff filed objections to the report of the special commissioner, which were overruled. These objections were permitted to stand as exceptions. On

March 12, 1941, the chancellor sustained the exceptions and ordered that the defendant "pay to plaintiff the sum of $25.00 per week as temporary alimony until the further order of this court; said order is entered *nunc pro tunc* as of September 29, 1939. The court finds that there is due to plaintiff from defendant at this time the sum of $1,900, and defendant is ordered to pay the same within 60 days from this date in addition to current payments falling due each week beginning with this day. It is further ordered that defendant pay to plaintiff the further sum of $750 on account of her temporary attorney's fees in two installments of $375 each, thirty and sixty days respectively after date." On March 17, 1941, the defendant filed his notice of appeal for the purpose of reversing the last mentioned order. On June 18, 1941, plaintiff filed her petition for a reasonable amount of money weekly for her support and maintenance during the pendency of the appeal, and for a sum of money for expenses and attorneys' fees incurred because of the appeal. The court heard the testimony of plaintiff and defendant on this petition. On July 1, 1941, the chancellor ordered the defendant to pay to plaintiff within 30 days therefrom the sum of $750 for attorneys' fees to defend the appeal, and the further sum of $100 for her expenses in connection with the appeal. This order also directed defendant to pay plaintiff $25 every week as and for the support of plaintiff during the pendency of the appeal. From this order defendant also appealed. The appeals were consolidated in this court.

Plaintiff's theory as to the first appeal is that she is the wife of the defendant, living separate and apart from him without fault on her part; that she is without sufficient means of her own with which to support herself during the pendency of the suit; that her husband has sufficient means with which to provide for her "notwithstanding the clumsy and ludicrous methods he has attempted in order to cover up his assets," and

that in view of all the circumstances she is entitled to an order for temporary support and attorneys' fees; and that the order entered for such purpose was a reasonable exercise of discretion by the trial judge and in all respects proper. Plaintiff's theory as to the second appeal is that if she was entitled to the first order for support, that it must necessarily follow that she would be unable to defend herself against an appeal from that order and would be helpless against her husband's attack on that order unless provided by a court order for the necessary funds to defend that appeal, and that this is in accordance with the provisions of the Divorce Act. The defendant's theory is that the provision of the statute for the allowance of temporary alimony and solicitor's fees in a separate maintenance suit is a humane measure to be exercised in the sound discretion of the court for the benefit of wives or husbands seeking in good faith protection of the law, who appear to be unable to conduct their litigation or pay their living expenses during the pendency of the suit; that such allowance may properly be made only when it appears that the suit has been brought in good faith and that the defendant has means to comply with the order; that the allowance of attorney's fees is not warranted unless there is some proof of value of such services, and that when the court has gone into the facts fully upon an application for temporary alimony and solicitor's fees and is fully advised as to the circumstances, alimony and solicitor's fees should not be allowed any more than they would be upon the final determination of the case.

The first point urged by defendant is that the record shows that the parties are not husband and wife for the reason that plaintiff's former husband is living and undivorced, and that hence alimony cannot be awarded to plaintiff. Defendant declares that the divorce decree in the Rest case has no more validity than it would have had the court granted such decree on the ground

of incompatability of temperament. Plaintiff insists
that the validity of the prior divorce cannot be attacked
in a collateral proceeding, and that no matter how vul-
nerable such a decree may be in a direct proceeding by
appeal, bill of review or other action, a stranger to the
record, such as defendant, has no right to dispute it.
The question of what shall constitute grounds for
granting a divorce, or whether the marriage contract
shall be dissolved under any circumstances, or for any
cause, is one of public policy and belongs to the legis-
lative, and not the judicial, department of our govern-
ment. (*Embree v. Embree,* 53 Ill. 394.) Section 4
of the Divorce Act (sec. 5, ch. 40, Ill. Rev. Stat. 1941
[Jones Ill. Stats. Ann. 109.172]) provides that ''the
Circuit Courts of the respective counties and the Su-
perior Court of Cook County shall have jurisdiction
in all cases of divorce and alimony allowed by this
act.'' Section 1 of the same act (sec. 1, ch. 40, Ill.
Rev. Stat. 1941 [Jones Ill. Stats. Ann. 109.169]) au-
thorizes the court to award a decree of divorce on
the ground of wilful desertion without any reasonable
cause for the space of one year. Hence, at the time
the decree in the Rest case was entered, the superior
court had jurisdiction to enter a decree for divorce
on the ground of wilful desertion without any reason-
able cause for the space of one year. Notice of the pend-
ency of the complaint for divorce was given to Sig-
mund Rest, through the mail to his last known place of
residence, and also by publication, all in accordance
with the law of this State. After hearing the testi-
mony introduced by plaintiff the court found Rest had
wilfully deserted and absented himself from the plain-
tiff without reasonable cause for the space of one year
immediately prior to the filing of the complaint and
awarded a divorce to the plaintiff on that ground. It
is undisputed in the record that the complaint for di-
vorce and the testimony in support thereof in the Rest
case was to the effect that the period of desertion was

from November 4, 1933 until January 24, 1934, being 2 months and 20 days. The testimony was heard on December 22, 1934, a little more than one year after the alleged desertion, and the decree of divorce was entered on January 2, 1935. We are of the opinion that the case of *People v. Prystalski,* 358 Ill. 198, while not a divorce case, serves to illustrate the principle involved. From that case it appears that Hazel Renke was charged in the municipal court of Chicago with having unlawfully in her possession a certain hypodermic needle and syringe adapted for the use of habit forming drugs, contrary to the statute in such case made and provided. She was found guilty and sentenced to serve a term of six months. *Habeas corpus* proceedings were instituted in the criminal court of Cook county, resulting in the discharge of Hazel Renke from custody. The State's Attorney petitioned the Supreme Court for an original writ of mandamus directing the trial judge to expunge the record, showing the discharge resulted in the release of the prisoner. The Supreme Court held (202) that *"mandamus* may not be invoked except where the order sought to be expunged is void for want of jurisdiction either of the subject matter, of the parties or want of jurisdiction to enter the order complained of. The only question, therefore, arising in the case before us, is whether the criminal court had jurisdiction and power to enter the order." The Supreme Court held that the information in the municipal court did not allege a crime, and said (205) :

"It is also true that a judgment entered on such information would not be sustained on review. (*People v. Berman,* [316 Ill. 547] ; *People v. Barnes,* 314 Ill. 140.) Does it follow, however, that the municipal court had no jurisdiction of the subject matter because the judgment entered was erroneous? If it had no jurisdiction of the subject matter the judgment was void and may be attacked by *habeas corpus. Habeas*

*corpus* may not be used as a writ of error to review a judgment, and where such judgment is erroneous but not utterly void no jurisdiction in *habeas corpus* arises to review such judgment. (*People v. Shurtleff,* 355 Ill. 210; *People v. Zimmer,* [252 Ill. 9].) Jurisdiction of a court to hear and determine a cause does not depend upon actual facts alleged but upon authority to determine the existence or non-existence of such facts and render judgment according to such finding. . . . The offense charged in the information under consideration here is a misdemeanor. The municipal court of Chicago is by statute given jurisdiction of misdemeanors, and the fact that the information was open to a motion to quash because it did not sufficiently charge a crime does not establish that the court did not have jurisdiction to enter the judgment. Jurisdiction, in a general and most appropriate sense of that term as applied to the subject matter, is always conferred by law, and it is a fatal error to suppose the power to decide in any case rests solely upon the averments in a pleading. The power to hear and determine a cause is jurisdictional. It is *coram judice* whenever a case is presented which brings this power into action. . . . Whether a complaint does or does not correctly state a cause of action is, so far as concerns the question of jurisdiction, of no importance, for if it states a case belonging to a general class over which the authority of the court extends then jurisdiction attaches and the court has power to decide whether the pleading is good or bad. . . . We are of the opinion that the municipal court had jurisdiction of the subject matter and of the person of Hazel Renke, and that while its judgment might have been reversed on review had a motion to quash the information been made and the question preserved, such fact did not give jurisdiction to the criminal court to review that judgment by *habeas corpus.* Hazel Renke was being held on a judgment and commitment which the municipal court had jurisdiction

to enter, and it follows that respondent was without jurisdiction to entertain a petition for *habeas corpus,* and the writ of mandamus will be awarded as prayed.''

In *O'Brien v. People ex rel. Kellogg Switchboard & Supply Co.,* 216 Ill. 354, the Supreme. Court said (363):

''Jurisdiction is the power to hear and determine the subject matter in controversy between the parties to a suit. If the law confers the power to render a judgment or decree, then the court has jurisdiction. Jurisdiction of the particular matter does not mean simple jurisdiction of the particular case then occupying the attention of the court, but jurisdiction of the class of cases to which the particular case belongs. Whether a complaint does or does not state a cause of action is, so far as concerns the question of jurisdiction, of no importance, for if it states a case belonging to a general class over which the authority of the court extends, then jurisdiction attaches and the court has power to decide, whether the pleading is good or bad. Jurisdiction does not depend upon the rightfulness of the decision. It is not lost because of an erroneous decision, however erroneous that decision may be.'' In *Foreman Bros. Banking Co. v. Kelly-Atkinson Construction Co.,* 218 Ill. App. 356, we said (358):

''In urging that the judgment be reversed, the defendant first contends that the judgment was void because the declaration showed no cause of action and no jurisdiction of the court to enter it. In our opinion the judgment was not void. We need not pass upon the question of whether the declaration showed a cause of action for, assuming it did not, it would not follow that the judgment is void. It would be erroneous at most. Likewise, the sufficiency of the declaration has nothing to do with the court's jurisdiction. A court may have full jurisdiction of an action—the parties and the subject matter—though the declaration may wholly fail to state a cause of action. It is not denied

that the court had jurisdiction of the parties to this suit. The jurisdiction of a court over the subject of a given case is the power of the court to hear and determine cases of the general class to which the case in question belongs."

The principle which controls and answers the criticism of defendant is stated in *Ullrich v. Ullrich*, 299 Ill. App. 460. Mrs. Ullrich filed her bill for separate maintenance on March 6, 1935, and one year and three days later, on March 9, 1936, her husband filed a cross bill for divorce. Answers were filed to both the bill and cross bill. On October 9, 1936, Mrs. Ullrich filed an amended complaint seeking divorce on the ground of cruelty. He answered, denying the charges. On December 2, 1936, an order was entered giving Mrs. Ullrich leave to amend her complaint so as to charge desertion, the answer of defendant then on file to stand to the complaint as amended. On December 16, 1936, the cause came on for hearing, both parties being represented by counsel, and a decree of divorce was granted to Mrs. Ullrich. Neither party appealed. The defendant Ullrich, approximately one year later on December 14, 1937, filed a bill of review to have the divorce decree annulled for error of law, apparent on the face of the decree, namely, that his desertion as a legal ground for the decree against him, had been suspended during the period while the separate maintenance complaint filed by Mrs. Ullrich was pending. The trial court struck Ullrich's complaint and dismissed the proceeding. On appeal this court affirmed the decree, and quoting with approval from *Gray v. First Nat. Bank of Chicago*, 294 Ill. App. 62, said (67): ". . . It is elementary that errors in a decree resulting from mistaken judgment going only to the correctness of the court's decision, . . . or errors resulting from a failure to present a defense existing at the time a judgment or decree is entered . . . may not be made the basis upon which equi-

table relief by way of a bill of review may be granted.''
The superior court had jurisdiction to grant the decree
of divorce in the Rest case, and we are of the opinion
that such decree cannot be attacked in a collateral
proceeding. It follows that the marriage of plaintiff
and defendant is valid.

As a second point defendant contends that the al-
lowance of temporary alimony, attorneys' fees and
suit money is warranted only where it is just and
equitable and the court must have reference to the con-
dition in life of the parties and the circumstances of
the case. He states that plaintiff does not seek relief
in good faith and is not without fault, and that she has
sufficient means of her own for support and to finance
her suit. Defendant also suggests that an order to
pay alimony must always be based on a showing of
ability to pay, and that he does not have the means
to comply with the court's orders. Plaintiff accepts
these statements as the law. She declares, however,
that the allowance of temporary alimony, attorneys'
fees and suit money is warranted in this case and that
the ability of the defendant to pay the same is amply
supported by the evidence. Because of the conflicting
views of what the evidence establishes, we have care-
fully read the transcript of the testimony and the ex-
hibits. Both parties are well past fifty years of age.
Plaintiff's first husband was Julius E. Levin. By him
she had one daughter and two sons, all of whom are
living. The daughter was about 30 years of age at the
time of the hearing, one son was 26 years and the other
son 22 years of age. Levin died in 1926, leaving plain-
tiff with a large and substantial estate. She married
Sigmund Rest about two years after her first hus-
band's death, and lived with him until November 4,
1933, and obtained a decree of divorce on January 2,
1935. She married Samuel Grossman on January 12,
1939. The testimony shows that she received upwards
of $100,000 on the death of her first husband. She

turned over $7,000 to one of her brothers for repayment as her needs might require. She testified that at the time of the hearing she had no income and no assets other than a diamond ring, once appraised for $4,500, but for which she would take $2,000. She also possessed a couple of inexpensive rings and some household furniture which she claimed would not bring $100, and that since her separation from the defendant she was being supported by her brothers, E. C. Klipper and Alfred Klipper, both of whom have died. She also received a part of her sustenance from her two sons and claims that her brothers gave her sufficient moneys with which to buy food and for household expenses and her sons contributed to pay her rent. Since the death of her two brothers, she commenced to live with a third brother who has a meager income. One of her sons is now serving in the United States Army, and the other, who is married, has moved to California where he works in an airplane factory. It appears that prior to her marriage to the defendant, practically all of the fortune left to her by her first husband was dissipated through bad investments. The defendant was married in 1905 and lived with his first wife until her death in 1935. They had two children, both of whom are living, a married daughter, Genevieve Hanock, and a son, Marvin Grossman, who is married. Genevieve was about 30 years of age at the time of the hearing and Marvin was about 25 years. In his earlier years the defendant was a manufacturer. Later he was engaged in buying and selling real estate. In 1922 he had acquired substantial holdings and had devoted himself to taking care of his properties. Prior to his marriage to Anita, the defendant owned the Harvard Theatre building at 63rd and Harvard avenue, Chicago, consisting of 17 stores, 18 apartments, 10 offices and an 800 seat theatre. The property was bought for $320,000. In 1933 the mortgage indebtedness was $150,000. Defendant had not been making any payments thereon.

The Aetna Life Insurance Company held the mortgage and was pressing him for payment. Plaintiff and defendant first became acquainted in January 1938, about a year before they married. Before they were married, defendant agreed to surrender his equity in the Harvard Theatre property to the life insurance company for $3,300 in cash, and plaintiff agreed that she would sign the deed. The $3,300 was paid to him. He testified that he borrowed $1,000 from an insurance company on a life insurance policy, and that it was with this $1,000 that the couple went on a honeymoon to Florida. He also testified that in 1933 his daughter Genevieve purchased the property at 6939 Wentworth avenue, Chicago, improved with a theatre known as the E. A. R. Theatre, 3 stores and 6 offices. He collected the rent for his daughter until two months prior to the hearing. The purchase price was $60,000, with $15,000 cash. At the time of the hearing there was a balance of $15,000 due on the mortgage. The rent collected for the theatre is $700 a month and $135 a month for the 3 stores. All the checks for rent were made payable to Genevieve Grossman, the maiden name of defendant's daughter. However, all the rent is collected by the defendant. He testified that the $15,000 in cash paid for the property at 6939 Wentworth avenue came out of either the defendant's safety-deposit box or his son's box, and that it was money given to the daughter preceding 1931. When his daughter was about to be married, the title to the theatre was transferred to the Gen-Marv Corporation, of which the daughter owns 98 per cent and the son 2 per cent. This corporate name is a combination of the names of the son and daughter, Genevieve and Marvin. The purpose of transferring the property to the corporation was to protect the daughter when she married. Defendant testified that the Gen-Marv Corporation had no bank account; that he collected the rent checks and indorsed them "G. Grossman"; that they were

cashed by him; that the cash was used by him to pay off the mortgage; that all of the cash was handled by him as the agent for his daughter in managing the property; that his daughter banked in the Northern Trust Company; that she accumulated the money collected for rent and put the same in a safety-deposit box; and that sometimes he would cash the checks and put the money in the safety-deposit box. We agree with plaintiff in her statement that there is great confusion in the defendant's statements as to just what happened to the money. It also appears that in 1937 defendant entered into a contract for the purchase of a theatre property located at 10555 Ewing avenue, Chicago. Immediately thereafter he assigned the contract to the East Side Theatre Corporation, which furnished the entire consideration therefor, $25,000. The outstanding stock of the East Side Theatre Corporation consists of 800 shares. A certificate for 319 shares was issued to Marvin Grossman, a certificate for one share to Samuel Grossman, and a certificate for the balance of the shares was issued to the Ellemo Corporation, which apparently was dominated by one Harry Lorsh. Marvin Grossman, son of the defendant, managed the East Side Theatre and was paid $50 a week for his services. Marvin testified that the contract for the Ewing avenue property was acquired for the purpose of putting him in business; that the money that was paid came from his (Marvin's) savings which had been given to him by his father; that at the time of the purchase, $11,000 in cash was paid. He (Marvin) acknowledged that four rent checks for $700 each for the theatre at 6939 Wentworth avenue went into his account as gifts from his father and that he used the proceeds of these checks in making the purchase of the Ewing avenue theatre. These are the checks which defendant testified he collected and cashed for his daughter. Defendant testified that he drove an automobile which was the property of his

son. The son testified that he (the son) drives an automobile and that his father also drives an automobile, which belongs to his father. Defendant testified that when they were keeping company, plaintiff told him that her former husband had loaned her brothers sums of money amounting to about $50,000; that she had a monthly income from her brothers; that he, defendant, arranged to cash a number of monthly checks for her; that she had an apartment on Lake Shore Drive; that her rent was $90 a month or more; that she had a personal maid, expensive furnishings and her own automobile; that she had silverware in the vault worth more than $14,000 and that she exhibited to him a valuable diamond ring which she said cost $7,500. He further testified that they returned from their honeymoon in Florida on February 12, 1939; that a day or two thereafter plaintiff went to a furrier without his knowledge and purchased a mink coat for $1,300; that the coat was delivered to plaintiff, who concealed it from defendant; that she did not keep it in the hotel rooms they occupied; that he did not see it until the commencement of the instant suit, when he found a bill from the furrier and investigated; that plaintiff kept the coat on the north side where her son lived; that she put it on while on the north side and went out to parties and returned the coat to her son's apartment and came back to the place where plaintiff and defendant lived with her old coat; that she purchased a summer dress for $90 and other items, all without defendant's knowledge; that upon their return from Florida they took up residence in the Carolan, an inexpensive family hotel on the south side of Chicago; that on Sunday, April 23, 1939, he became ill and entered a hospital; that during the week he was in the hospital plaintiff left their home to visit her daughter at Antigo, Wisconsin; that she did not visit him or get in touch with him when he was in the hospital; that when he recovered he got in touch with

her through her son and persuaded her to come back and live with him; that the parties remained together two months longer; that he was called to Wisconsin in July on a business prospect and while there he read in a daily newspaper the account of his wife having filed a complaint against him for separate maintenance. Defendant maintains that after her second abandonment of him she resumed her previous domicile with her son and lived in substantially the same manner as prior to her marriage and resumed the name of her first husband.

Defendant would have us believe that for many years he has been dependent upon the bounty of his son and daughter. The evidence shows that he possessed an automobile which is his property, and that he collects the rent and manages the property on Wentworth avenue. The defendant is to be commended for having provided for his son and daughter. The purchase of the Wentworth avenue property by the daughter, which was later transferred to a corporation in which the daughter holds practically all of the stock, and the purchase of approximately 40 per cent of the stock of the corporation which owns the theatre on Ewing avenue, were made prior to the time when the defendant and plaintiff became acquainted. Therefore, it cannot be said that any of these transactions were in fraud of plaintiff's rights. If the defendant has no interest in the two theatre properties, then the income from such properties should not be considered in determining whether the allowance of temporary alimony, solicitor's fees and suit money should stand. If, on the other hand, the transactions were merely colorable, and the defendant is in reality the beneficial owner of the properties, then of course, we should consider the income from such properties in determining the issues before us. The son testified. The daughter did not testify. The record shows that defendant manages the Wentworth avenue property, collects the rents, indorses his name to the checks and that on some oc-

casions he delivered such checks to his son, who applied the proceeds thereof on the purchase of the Ewing avenue property. On cross-examination, defendant, in response to a question as to whether he testified by deposition in a case wherein he, defendant, was being sued for a real estate commission, answered in the affirmative. He was also asked whether in the taking of such deposition, in answer to a question by Attorney Joseph M. Taussig as to how many shares he owned in the East Side Theatre Corporation he did not answer ''I own 320 shares,'' and he testified that he did not so answer. Mr. Taussig, testifying for the plaintiff, stated that he interrogated Samuel Grossman in a case in the municipal court of Chicago in which H. L. Newman & Company, a corporation, and others, were suing defendant for a real estate commission. Mr. Taussig read from the deposition of defendant and stated that defendant was asked whether he owned any stock in the East Side Theatre Corporation and that he answered in the affirmative; that in answer to a question as to how many shares he owned, he answered, ''320,'' and that he retained the attorney who formed the corporation. The testimony of Mr. Taussig is entitled to great weight, particularly as he read from the deposition given by defendant. These are the shares which defendant's son claims he (the son) owns. At his age and without a competence, it is unlikely that he would retire. Apparently, he is quite active and is possessed of sufficient funds from such activity so that he does not need to seek employment other than managing the properties. It is unnecessary for us at this time to make a finding that the defendant is the actual beneficial owner of the properties on Wentworth avenue and Ewing avenue. All that is necessary is that we find that he has the ability to pay the amount which the court orders, providing the order is reasonable. It appears that the two brothers who helped to support plaintiff have died; that her sole sur-

viving brother is not in the best of circumstances; that one son is in the army and the other son is married and living on the Pacific coast. We are of the opinion that plaintiff is entitled to an allowance for temporary alimony, solicitor's fees and suit money. While the parties presented much testimony, the case has not been heard on its merits. We cannot say at this time that the plaintiff does not seek relief in good faith or that she is at fault. These points are disputed by the parties and can only be determined after the case has been fully presented. It will be observed that the master did not find that plaintiff lacked good faith in bringing her complaint, nor did he find whether plaintiff is or is not living separate and apart from her husband without any fault on her part. Determination of these points must necessarily await the trial of the case on the merits. So far as the case has proceeded, we are of the opinion that plaintiff is acting in good faith in the prosecution of her suit. Having considered all the circumstances, we are of the opinion that an allowance for temporary alimony at the rate of $15 per week beginning September 29, 1939, is reasonable. The record shows that he will be able to comply with such an order. At this time we are unable to say that plaintiff is possessed of sufficient funds to maintain herself while the suit is pending and to prosecute the same.

Defendant maintains that the order of September 29, 1939 awarded temporary alimony in gross and that this may not be done. At the time plaintiff presented her motion for temporary alimony, solicitor's fees and suit money, the matter was referred to a master in chancery. The court then reserved the right to enter an order for temporary alimony as of the date of the reference. Plaintiff and defendant, by their attorneys, consented to the entry of this order. It is obvious that the court did not award alimony in gross. All the court did was to allow alimony from the time the

motion therefor was made. At the time the motion was entered both parties recognized that the court reserved the right to have any order for alimony that might be entered date back to the time when the order of reference was entered. Defendant finally contends that in fixing attorney's fees the court should have regard to what is customary and usual for such services and not what the attorney himself thinks is reasonable. Plaintiff's attorney testified that he put in more than 100 hours and that it would take 20 more hours to finish the proceedings; that he was accustomed to charging $20 an hour for trial work where the client could afford to pay such amount, and in other cases $10 an hour, and points out that the rate allowed by the court was a little more than $6 an hour. The court directed defendant to pay $750 on account of temporary attorney's fees and a like sum for attorney's fees for services rendered in the appeal, plus $100 in connection with the expenses of the appeal. The court has a right to take into consideration its knowledge of the value of the services rendered by "the very competent counsel who represents the plaintiff in this case," as so graciously expressed by counsel for defendant. (*Gentleman v. Sanitary District,* 260 Ill. 317, 321.) No one will contend that a charge of $6 an hour is excessive. However, under the circumstances disclosed, we are of the opinion that an allowance of $400 for temporary solicitor's fees and $300 for services in this appeal is appropriate although perhaps inadequate.

For the reasons stated, the orders of the superior court of Cook county are reversed and the cause remanded with directions to the chancellor to enter an order requiring the defendant to pay to the plaintiff as temporary alimony the sum of $15 per week, commencing September 29, 1939, and until the further order of the court; the sum of $400 for temporary attorney's fees; $300 as fees for her attorney's services

in these appeals, and her expenses in these appeals not exceeding $100, and for further proceedings not inconsistent with this opinion.

*Reversed and remanded with directions.*

HEBEL and KILEY, JJ., concur.